IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

| | |
|---|---|
| Oscar Fernandez, Individually and as Administrator of the Estate of Isidro Fernandez, | CASE NO. 20-cv-2079-MAR |
| Plaintiff, | |
| vs. | |
| Tyson Foods, Inc.; Tyson Fresh Meats, Inc.; John H. Tyson; Noel W. White; Dean Banks; Stephen R. Stouffer; Tom Brower; Tom Hart; Cody Brustkern; John Casey; and Bret Tapken, | |
| Defendants. | |

---

**RESISTANCE TO MOTION TO REMAND**


**(Oral Argument Requested)**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................... 1

BACKGROUND ........................................................................... 3

      A.    The Complaint and motion to remand ........................................ 3

      B.    Federal "critical infrastructure" designation and collabo-
           ration with federal officers to continue operations. ................... 4

      C.    The April 28 Executive Order invoking the Defense Pro-
           duction Act. ........................................................................... 9

ARGUMENT ........................................................................... 10

    I.    This Court has jurisdiction under the federal officer removal
       statute. ........................................................................... 10

      A.    Tyson acted under the direction of federal officers. .................. 11

      B.    There is a sufficient causal nexus between Tyson's actions
           and federal directions. ............................................................ 14

      C.    Tyson has colorable federal defenses. ...................................... 15

    II.    The Court has federal question jurisdiction because Plaintiff's
       claims necessarily raise substantial and disputed issues of fed-
       eral law. ........................................................................... 19

CONCLUSION ........................................................................... 20

Case 6:20-cv-02079-LRR-KEM   Document 31   Filed 11/16/20   Page 2 of 27

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Betzner v. Boeing Co.*,
910 F.3d 1010 (7th Cir. 2018) ................................................................... 2, 11, 12

*Boyle v. United Techs. Corp.*,
487 U.S. 500 (1988) ...................................................................................... 19

*CRGT, Inc. v. Northrop Grumman Sys. Corp.*,
Civ. A. No. 1:12-cv-554, 2012 WL 3776369 (E.D. Va. Aug. 28, 2012) ................... 12

*Crosby v. Nat'l Foreign Trade Council*,
530 U.S. 363 (2000) ...................................................................................... 18

*E. Air Lines, Inc. v. McDonnell Douglas Corp.*,
532 F.2d 957 (5th Cir. 1976) ........................................................................ 12, 13

*Grable & Sons Metal Prod., Inc. v. Darue Eng'g & Mfg.*,
545 U.S. 308 (2005) ...................................................................................... 19, 20

*Hargis v. Access Capital Funding, LLC*
674 F.3d 783 (8th Cir. 2012) ........................................................................... 3

*Jacks v. Meridian Res. Co.*,
701 F.3d 1224 (8th Cir. 2012) ................................................................... 10, 12, 15

*Jefferson Cnty. v. Acker*,
527 U.S. 423 (1999) ................................................................................. 2, 11, 17

*Latiolais v. Huntington Ingalls, Inc.*,
951 F.3d 286 (5th Cir. 2020) (en banc) ....................................................... 2, 14, 15

*Maryland v. Soper (No. 1)*,
270 U.S. 9 (1926) .......................................................................................... 12

*McMahon v. Presidential Airways, Inc.*,
410 F. Supp. 2d 1189 (M.D. Fla. 2006) ............................................................. 20

*Nat'l Meat Ass'n v. Harris*,
565 U.S. 452 (2012) ...................................................................................... 16, 18

*Papp v. Fore-Kast Sales Co.*,
842 F.3d 805 (3d Cir. 2016) ............................................................................ 15

-ii-

# TABLE OF AUTHORITIES
(continued)

Page(s)

CASES (CONT.)

*Rancho Viejo, LLC v. Norton,*
    323 F.3d 1062 (D.C. Cir. 2003) .............................................................................. 18

*Riegel v. Medtronic, Inc.,*
    552 U.S. 312 (2008) ............................................................................................. 18

*Savage v. Jones,*
    225 U.S. 501 (1912) ............................................................................................. 19

*Sawyer v. Foster Wheeler LLC,*
    860 F.3d 249 (4th Cir. 2017) .............................................................................. 14

*Scrogin v. Rolls-Royce Corp.,*
    No. 3:10cv442 (WWE), 2010 WL 3547706 (D. Conn. Aug. 16, 2010) .................... 20

*Watson v. Philip Morris Cos.,*
    551 U.S. 142 (2007) ....................................................................................... 11, 12

*Wullschleger v. Royal Canin U.S.A., Inc.,*
    953 F.3d 519 (8th Cir. 2020) ........................................................................ 19, 20

STATUTES

21 U.S.C. § 608 ............................................................................................................ 17

21 U.S.C. § 678 ................................................................................................. 15, 17, 18

28 U.S.C. § 1442(a)(1) ............................................................................................... 10

OTHER AUTHORITIES

9 C.F.R. § 381.36(f)(1)(vi) ......................................................................................... 16

9 C.F.R. § 416.5(b) ..................................................................................................... 16

9 C.F.R. § 416.5(c) ..................................................................................................... 16

85 Fed. Reg. 15,337 (Mar. 18, 2020) .......................................................................... 6

85 Fed. Reg. 26,313 (Apr. 28, 2020) ................................................................. 3, 9, 13

## INTRODUCTION

This case is properly removed to federal court because Plaintiff is attempting to countermand federal statutes and federal directions to Tyson as part of a national emergency response to an unprecedented pandemic. The facility at issue was designated as critical infrastructure by federal officials, and Tyson worked "hand-in-hand" with federal officials from the time of the declaration of a national emergency on March 13 to safely continue operations to secure the national food supply. Plaintiff asserts that Tyson should have operated the facility differently or even shut it down. Those allegations directly conflict with Tyson's working at the direction of the U.S. Department of Homeland Security and the U.S. Department of Agriculture to continue operations. Removal was proper for the following reasons.

**First,** Plaintiff does not appear to dispute that a presidential directive under the Defense Production Act permits federal officer removal. Instead, Plaintiff's primary argument is one of timing—that Mr. Fernandez contracted COVID-19 before the April 28, 2020 presidential order, which Plaintiff treats as the only sufficiently "formal" federal action for purposes of removal or liability. But Plaintiff largely ignores that Tyson operated at the direction of federal officials as part of the federally designated "critical infrastructure" from the declaration of a national emergency on March 13. Indeed, employees of the USDA's Food Safety Inspection Service (FSIS) were on-site at Tyson's facilities throughout. Tyson's employees had personal letters authorizing their service to "critical infrastructure," so that those employees could explain their exemption from local lockdowns should any authorities question them. Congress even appropriated supplemental funding to accommodate the continued presence of FSIS at facilities during the pandemic precisely because continued operations were part of the federal emergency effort.

The order on April 28 was merely another step in a long line of federal efforts to keep critical infrastructure operating and confirmed the federal direction from the

outset. And the April 28 order was in direct response to state and local interference and confirmed continued operations under uniform *federal* direction.

**Second,** to the extent Plaintiff argues that his claims must arise directly from federal orders or under federal law to be removable, Plaintiff is not following the correct standards. After statutory amendments in 2011, this case is removable so long as Plaintiff's claims are merely "connected" or "associated" with federal directions. *See Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 292 (5th Cir. 2020) (en banc). They plainly are. Plaintiff asserts that Tyson should have followed standards other than the federal directions or shutdown entirely. It also does not matter that Plaintiff is not explicitly bringing claims under a federal statute. The well-pleaded complaint rule does not apply to federal officer removal, and a federal defense suffices to establish a federal jurisdictional nexus. In terms of the applicable standard, Tyson need only present a plausible application of 28 U.S.C. § 1442, and its federal defense need only be colorable. *See Betzner v. Boeing Co.*, 910 F.3d 1010, 1013-14 (7th Cir. 2018). A defendant is not required to virtually "win his case before he can have it removed," *Jefferson Cnty. v. Acker*, 527 U.S. 423, 431 (1999) (citation omitted), and Tyson is not obligated at this stage to demonstrate that it will prevail on its federal defenses.

**Finally,** this Court also has federal question jurisdiction under 28 U.S.C. § 1331 because Plaintiff's claims, although pleaded in terms of state law, necessarily raise substantial and disputed issues of federal law.

Tyson has worked from the beginning of the pandemic to follow federal workplace guidelines and has invested millions of dollars to provide employees with safety and risk-mitigation equipment. Those efforts continue. Because those efforts are pursuant to federal statutes and federal directions to Tyson as part of a national emergency response to the COVID-19 pandemic, removal to federal court was appropriate.

**BACKGROUND**

### A. The Complaint and motion to remand.

Plaintiff alleges fraudulent misrepresentation and gross negligence in connection with the death of his relative, Mr. Fernandez, "from complications of COVID-19." (Dkt. 2 ¶ 3.)[1] Plaintiff alleges that Mr. Fernandez's "injuries arose out of and in the course of [Mr. Fernandez's] employment with Tyson Foods," (*id.* ¶ 4), but no additional facts as to how he contracted COVID-19 or to rule out contraction from another community source. Instead, Plaintiff identifies categories of "acts and omissions" that Tyson supposedly failed to take in response to COVID-19. (*Id.* ¶¶ 98, 109(a)-(cc), 125.) Plaintiff also pleads Tyson's "prolonged refusal to temporarily close down the Waterloo Facility" as evidence of alleged misconduct. (*Id.* ¶ 100.) Again, Plaintiff does not allege any specific incident or event that led to Mr. Fernandez's illness.

In moving to remand, Plaintiff treats the Executive Order of April 28, 2020 as the sole potential basis for Tyson's removal. *See* Exec. Office of Pres., *Executive Order on Delegating Authority Under the DPA with Respect to Food Supply Chain Resources During the National Emergency Caused by the Outbreak of COVID-19* ("Food Supply Chain Resources"), 85 Fed. Reg. 26,313, 26,313 (Apr. 28, 2020). That order directed the Secretary of Agriculture "to ensure that meat and poultry processors continue operations consistent with the guidance for their operations jointly issued by the CDC and OSHA." *Id.* And the President specifically underscored that "[i]t is important that processors of beef, pork, and poultry . . . in the food supply chain continue operating and fulfilling orders to ensure a continued supply of protein for Americans." *Id.*

Plaintiff seems to tacitly accept that following that order would be a proper basis for federal officer removal. But he argues that "[b]ecause [Mr. Fernandez] contracted COVID-19 . . . weeks before" the Executive Order was issued, the order only

---

[1] Plaintiff filed an amended complaint on November 11, 2020. (Dkt. 29.) However, because the Petition (Dkt. 2) was "the operative complaint at the time of removal," it "controls this determination." *See Hargis v. Access Capital Funding, LLC*, 674 F.3d 783, 789–90 (8th Cir. 2012). Tyson therefore continues to cite the Petition in this Resistance.

demonstrates "whether . . . [Tyson] was acting under a federal officer as of April 28" and thus cannot serve as the basis for removal. [Mot. 4, 10]

Plaintiff fails to adequately address the fact that the Tyson facility at issue was designated as "critical infrastructure" by federal officials, and that from the very beginning of a federal response to the pandemic Tyson worked at the direction of the U.S. Department of Homeland Security and the U.S. Department of Agriculture to safely continue operations as part of the nation's "critical infrastructure." Instead, Plaintiff attempts to minimize the repeated and significant directions Tyson received from federal officers by focusing on just one "federal directive," the President's March 16 *Coronavirus Guidelines for America*. [Mot. 4] But, as explained in more detail below, those guidelines were just one of *many* federal directives, both formal and informal, under which Tyson was operating its facilities.

## B.  Federal "critical infrastructure" designation and collaboration with federal officers to continue operations.

Tyson Foods is the largest food company in the U.S., providing more than 20% of the nation's supply of meat and poultry—enough to feed 60 million Americans every day. Tyson employs more than 120,000 workers at processing facilities.

**Critical infrastructure.** After the events of 9/11, the federal government devoted significant resources and reorganization to the mission of protecting the nation's "critical infrastructure." The USA Patriot Act defined "critical infrastructure" at 42 U.S.C. § 5195c(e), and upon the creation of the Department of Homeland Security in 2002, that new department has headed federal government planning for protection and resilience of "critical infrastructure" against threats. (Declaration of Barbara Masters ("Masters Decl.") ¶ 8 & Attachment C.) Of particular significance here is Presidential Policy Directive 21, which was issued by President Obama on

February 12, 2013.[2] Its purpose was to "advance[] a national unity of effort to strengthen and maintain secure, functioning, and resilient critical infrastructure."

There are 16 "sectors" of the national defense and economy "whose assets, systems, and networks, whether physical or virtual, are considered so vital to the United States that their incapacitation or destruction would have a debilitating effect on security, national economic security, national public health or safety, or any combination thereof."[3] All components of the Food and Agriculture Sector are considered critical infrastructure. The federal government uses the graphic below to represent them:



(Masters Decl. ¶ 8 & Attachment D.)

Coordinating protection of the Food and Agricultural Sector has been assigned to the Departments of Agriculture and Health and Human Services, which have an extensive critical infrastructure plan for the Sector.[4] The mission of that plan is "to

---

[2] https://obamawhitehouse.archives.gov/the-press-office/2013/02/12/presidential-policy-directive-critical-infrastructure-security-and-resil

[3] https://www.cisa.gov/critical-infrastructure-sectors

[4] https://www.cisa.gov/sites/default/files/publications/nipp-ssp-food-ag-2015-508.pdf

protect against a disruption anywhere in the food system that would pose a serious threat to public health, safety, welfare, or to the national economy.[5]

**President declares national emergency.** On March 13, 2020, the President declared that "the COVID-19 outbreak in the United States constitutes a national emergency, beginning March 1, 2020." Exec. Office of Pres., *Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak*, 85 Fed. Reg. 15,337, 15,337 (Mar. 18, 2020). At the time of that declaration—the first time in history that all 50 states have been subject to disaster orders at one time—Tyson was in close contact with officials at the U.S. Department of Homeland Security and the U.S. Department of Agriculture regarding continued operations as "critical infrastructure." It may be recalled that in the early stages of the pandemic in the U.S., there was significant hoarding of food and other items like toilet paper. The President met with food industry executives on March 15 to discuss the stability of the supply chain. Tyson was part of that. The President described "hand-in-hand" cooperation with the federal government to keep supply chains operating:

> "All of them are working hand-in-hand with the federal government as well as the state and local leaders to ensure food and essentials are constantly available," President Trump said. "We had a long conversation with them and they're going to work 24 hours around the clock, keeping their store stocked."[6]

**Hand-in-hand collaboration.** As an example of that "hand-in-hand" collaboration the President cited, Tyson communicated directly with the Deputy Assistant Director for the National Risk Management Center regarding "critical infrastructure" designations for particular functions and employees—such as trucking and other services necessary to continue operations. (Masters Decl. ¶¶ 7, 11 & Attachments A & B.) For example, on March 13, as part of the coordination of "critical infrastructure"

---

[5] *Id.* at 13.

[6] https://www.foodbusinessnews.net/articles/15621-trump-meets-with-food-company-leaders

designations and response to the pandemic, the Department of Transportation approved special status for workers providing transportation to support the "emergency restocking of stores." (*Id.* ¶ 12.)

The U.S. Department of Homeland Security relied upon its "National Critical Functions Set" to designate "Produce and Provide Agricultural Products and Services" and "Produce and Provide Human and Animal Food Products and Services" as critical "supply" functions. (*Id.*, Attachment D.) Those designations flowed down to individual employees who received letters authorizing them to continue working and traveling in support of "critical infrastructure" notwithstanding any state or local quarantine restrictions. They were instructed to keep the letters on them at all times and be prepared to show them to officials. (*Id.* ¶ 13 & Attachment D).

Tyson also communicated regularly with officials in the U.S. Department of Agriculture, such as Paul Kiecker, FSIS Administrator. (*Id.* ¶ 16.) FSIS employees were on-site at meat and poultry processing facilities, and on March 16, 2020, the Department of Agriculture issued a statement that it was committed to the "timely delivery of the services to maintain the movement of America's food supply from farm to fork," and that it was "prepared to utilize their authority and all administrative means and flexibilities to address staffing considerations." (*Id.* ¶ 17 & Attachments H & I.) To that end, the U.S. Department of Agriculture and Federal Emergency Management Agency received and responded to personal protective equipment and other critical supply requests so that Tyson could keep operating as directed. (*Id.* ¶ 14 & Attachments E & F.)

**White House Guidelines.** On March 16, the White House issued *Coronavirus Guidelines for America*. Those guidelines stated directly: employees in "critical infrastructure industr[ies]" have a "special responsibility." Exec. Office of Pres., *The President's Coronavirus Guidelines for America* ("Coronavirus Guidelines for America"), Mar. 16, 2020, at 2. (Masters Decl., Attachment G.) In their continued operations,

critical infrastructure employers and workers "should follow CDC guidance to protect [their] health at work." *Id.*

Over the next weeks, Tyson had frequent contact with federal officers regarding the best way to safely continue operations, in particular with FSIS. (Masters Decl. ¶ 16.) Federal officials reiterated the need for continued operations supported by the agencies themselves. Assistant Administrator Philip Bronstein issued guidance on March 20 that emphasized that the USDA "seeks a united effort with our industry partners in preventing the spread of COVID-19 while continuing to produce safe food for consumers." (*Id.* ¶ 17 & Attachment I.) Shortly thereafter, Congress allocated additional funding to FSIS to help maintain FSIS presence at facilities so that operations could continue. An FSIS notice to industry on April 3 explained that "FSIS has received additional funding for increased expenditures associated with executing the FSIS mission during the pandemic." (*Id.* ¶ 18 & Attachment J.)

Having taken all of these measures to keep the critical food supply function operating, Vice President Pence on April 7 thanked everyone working to continue safe operations, emphasized the critical federal interests at issue, and implored everyone to keep working to stay open:

> And so, on behalf of the President, on behalf of our entire team, and on behalf of a grateful nation, let me just say to all of you that are working in the food industry at every level across the country: Just understand that you are vital. You are giving a great service to the people of the United States of America. **And we need you to continue, as a part of what we call our critical infrastructure, to show up and do your job and know that we're going to continue to work tirelessly in working with all of your companies to make sure that that workplace is safe**.[7]

But notwithstanding the close collaboration between Tyson and federal officials to safely continue operations, state and local officials began asserting

---

[7] https://www.whitehouse.gov/briefings-statements/remarks-president-trump-vice-president-pence-members-coronavirus-task-force-press-briefing-april-7-2020/ (emphasis added).

contradictory authority with respect to meat and poultry processing facilities. (Masters Decl. ¶ 20.) Those state and local actions led to an Executive Order re-emphasizing federal supremacy with respect to those facilities and their operations and the critical need for consistent, uniform rules. (*Id*. & Attachment K.)

### C. The April 28 Executive Order invoking the Defense Production Act.

The President issued an Executive Order on April 28, specifically citing "recent actions in some States have led to the complete closure of some large processing facilities. Such actions may differ from or be inconsistent with interim guidance recently issued by the Centers for Disease Control and Prevention (CDC) of the Department of Health and Human Services and the Occupational Safety and Health Administration (OSHA) of the Department of Labor." *See* Food Supply Chain Resources, 85 Fed. Reg. at 26,313. In response to those non-federal actions, the President directed the Secretary of Agriculture "to ensure that meat and poultry processors continue operations consistent with the guidance for their operations jointly issued by the CDC and OSHA." *Id*. The President specifically underscored that "[i]t is important that processors of beef, pork, and poultry . . . in the food supply chain continue operating and fulfilling orders to ensure a continued supply of protein for Americans." *Id*.

The same day, the Secretary of Agriculture announced that his Department would "work with meat processing to affirm they will operate in accordance with the CDC and OSHA guidance" and "ensure that facilities implementing this guidance to keep employees safe can continue operating." U.S. Dep't of Agric., *USDA to Implement President Trump's Executive Order on Meat and Poultry Processors*, Apr. 28, 2020.[8] Reiterating that "[o]ur nation's meat and poultry processing facilities play an integral role in the continuity of our food supply chain," the Secretary explained that the CDC and OSHA guidance would "help ensure employee safety to reopen plants

---

[8] https://www.usda.gov/media/press-releases/2020/04/28/usda-implement-president-trumps-executive-order-meat-and-poultry

or to continue to operate those still open" and "ensure that these plants are allowed to operate to produce the meat protein that Americans need." *Id.*

The CDC and OSHA have continually updated their guidance as new information about the disease comes to light. *See Meat and Poultry Processing Workers and Employers: Interim Guidance from CDC and the Occupational Safety and Health Administration (OSHA)* (updated July 9, 2020).[9] But the message from the President and the Department of Agriculture has remained clear and unchanged from the beginning: Meat and poultry processors should continue to operate subject to applicable federal guidance from the CDC and OSHA.

## ARGUMENT

### I. This Court has jurisdiction under the federal officer removal statute.

Under 28 U.S.C. § 1442(a)(1), a civil action may be removed to federal court if the action is asserted against a person acting under the direction of a federal officer:

> A civil action . . . that is against or directed to any of the following may be removed . . . :
>
> (1) The United States or any agency thereof or any officer (*or any person acting under that officer*) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office . . . .

28 U.S.C. § 1442(a)(1) (emphasis added). Tyson properly removed this case to federal court under Section 1442(a)(1) because (1) Tyson "acted under the direction of a federal officer," (2) "there was a causal connection between [Tyson's] actions and the official authority," (3) Tyson "has a colorable federal defense to the plaintiff's claims," and (4) Tyson "is a 'person,' within the meaning of the statute." *Jacks v. Meridian Res. Co.*, 701 F.3d 1224, 1230 (8th Cir. 2012) (citing *Dahl v. R.J. Reynolds Tobacco Co.*, 478 F.3d 965, 967 n.2 (8th Cir. 2007)).

---

[9] https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/meat-poultry-processing-workers-employers.html.

## A. Tyson acted under the direction of federal officers.

Plaintiff does not—and cannot—dispute that compliance with the April 28 Executive Order would permit federal officer removal. What Plaintiff attempts to argue is that somehow actions taken before that Order were not acting under the direction of a federal officer. In making that argument, Plaintiff—and its *amicus* Public Citizen—pay insufficient regard to the national emergency declaration on March 13 and the directions to "critical infrastructure" that ensued based upon established national emergency plans.

For removal to be proper, Tyson need only show that it is "plausible" that it was acting under the direction of federal officers, *see Betzner*, 910 F.3d at 1013-14, and a defendant is not required to virtually "win his case before he can have it removed," *Jefferson Cnty.*, 527 U.S. at 431 (citation omitted). Here, Tyson operated its facilities—including the Waterloo facility—as critical infrastructure of the United States pursuant to "critical infrastructure" emergency plans growing out of Presidential Policy Directive 21 of the Obama Administration, which were followed upon declaration of a national emergency. In so doing, Tyson was in constant contact with federal officials at the Department of Homeland Security and the USDA regarding continued operations, including the facilitation of USDA's own FSIS employees at Tyson's facilities. The purpose of those actions was to secure the food supply during a national emergency at the direction of federal officers. Those actions more than plausibly satisfy the standard for federal officer removal.

In the parlance of the Supreme Court's most recent case discussing federal officer removal, Tyson's actions were not mere "compliance (or noncompliance) with federal laws, rules, and regulations." [Mot. 5 (quoting *Watson v. Philip Morris Cos.*, 551 U.S. 142, 143 (2007))] Rather, Tyson was working hand-in-hand with federal officers to "produce an item that [the government] needs" for the national defense. *Watson*, 551 U.S. at 153. It is well established that private providers to the government

of military products (*see, e.g.*, *Betzner*, 910 F.3d at 1013) or health benefits (*see, e.g.*, *Jacks*, 701 F.3d at 1230) can invoke federal officer removal.

Here, Tyson was acting at the direction of federal officers in a time of emergency to provide the food security that the government desired. While the April 28 order was certainly a clear, formal order from the President, Plaintiff cannot dispute—and does not dispute—that federal officers designated Tyson and its employees as "critical infrastructure," and the whole point of that designation is to continue operations during an emergency, working with the Department of Homeland Security and USDA, the designated leader with respect to the Food and Agricultural Sector of "critical infrastructure." To that end, the "critical infrastructure" designation flowed down to individual employees and suppliers who were given letters specifically directing them to keep them in their possession at all times and present them to authorities if they were otherwise subject to lockdown or quarantine orders. (Masters Decl. ¶¶ 12-13 & Attachment D.) And the federal government itself dedicated employees of the FSIS, and Congress allocated additional funding, precisely for the purpose of continued operations under federal oversight. (*Id.* ¶¶ 16-18.)

To the extent some of the federal direction may have been more "informal," including emails, phone calls, and weekly meetings with FSIS and other federal officials regarding how to maintain operations safely, that informality does not change the fact that Tyson was still receiving and following federal direction. If federal agents direct a private person to drive a car in pursuit of bootleggers, that qualifies for federal officer removal. *See Watson*, 551 U.S. at 149-50 (discussing *Maryland v. Soper (No. 1)*, 270 U.S. 9 (1926)). Or if a federal contracting officer tells a contractor to stop work or hold an invoice, that likewise qualifies. *See CRGT, Inc. v. Northrop Grumman Sys. Corp.*, Civ. A. No. 1:12-cv-554, 2012 WL 3776369, at *2 (E.D. Va. Aug. 28, 2012). And with respect to the Defense Production Act in particular, the President's "broad authority" under that statute can be exercised through either "formal, published regulations" or "informal and indirect methods of securing compliance." *E.*

*Air Lines, Inc. v. McDonnell Douglas Corp.*, 532 F.2d 957, 992-93 (5th Cir. 1976). That case famously held that federal officials invoked their authority with a defense contractor through "jawboning" as opposed to formal orders like the April 28 order here. Any supposed "informality" to federal instructions is especially irrelevant here, given the shadow of the President's authority under the Defense Production Act ("DPA"). The President made that specific point on March 24 with respect to the provision of masks: "The Defense Production Act is in full force, but haven't had to use it because no one has said NO!"[10] The Fifth Circuit has recognized that such dynamics still amount to government orders and actions, that "the threat of mandatory powers would be used as a 'big stick' to induce voluntary cooperation." *E. Air Lines*, 532 F.2d at 998. And that is especially appropriate in a time of emergency, as "a cumbersome and inflexible administrative process is antithetical to the pressing necessities." *Id.* And eventually the President did invoke the DPA to confirm the supremacy of federal directions during this national emergency.

Contrary to Plaintiff's assertion (at 4-5), *E. Air Lines* is instructive and persuasive here because it refutes Plaintiff's argument that federal officers were required to formally "invoke" the DPA to enlist Tyson's assistance during the national emergency. In fact, federal officers need not issue "formal . . . directives . . . in strict compliance with the [DPA]" and "often [can] effectively achieve[] the same result by more informal and less direct means." *E. Air Lines*, 532 F.2d at 964 & 980. That is precisely what occurred here prior to the President's Executive Order. Finally, Plaintiff mischaracterizes Tyson's argument as asserting that the "mere threat of government action" is sufficient for federal officer removal and that "the only action Tyson claims to have taken at the direction of a federal officer" is "keeping the facility open." [Mot. 5, 7] Those are not Tyson's arguments. First, Tyson has described far more than a "mere threat"—federal officers worked hand-in-hand with Tyson from the beginning of the

---

[10] https://mobile.twitter.com/realdonaldtrump/status/1242421041193988096

pandemic and issued detailed directives for Tyson's continued operations in order to maintain the nation's food supply. Second, those directives did not only pertain to "keeping the facility open." From the beginning, Tyson was under federal direction to "continue operations consistent with the guidance for their operations jointly issued by the CDC and OSHA." *Food Supply Chain Resources*, 85 Fed. Reg. at 26,313; *Coronavirus Guidelines for America* at 2. That does not mean operate under any circumstances. The fact that Tyson suspended operations at the Waterloo facility between April 22 and May 7 (*see* Mot. 6-7) does not alter the fact that Tyson was operating as critical infrastructure under federal direction.

### B. There is a sufficient causal nexus between Tyson's actions and federal directions.

Plaintiff challenges Tyson's actions under the direction of federal officers, and therefore the causal connection required by Section 1442(a) is present here.

Plaintiff argues that Tyson must "prove a causal nexus" by establishing "that the lawsuit 'has arisen out of the acts done by [it] under color of federal authority and in enforcement of federal law.'" [Mot. 6 (quoting *Mesa v. California*, 489 U.S. 121, 131-32 (1989)] As an initial matter, that statement of the standard pre-dates the 2011 statutory amendments. Those amendments "ma[de] removable to federal court '[a] civil action . . . that is against or directed to . . . any person acting under [a federal] officer . . . *for or relating to* any act under color of such office.'" *Latiolais*, 951 F.3d at 292 (quoting 28 U.S.C. § 1442(a)) (emphasis added). The statute no longer imposes a "direct causal nexus" requirement. *Id*. By "plainly express[ing] that a civil action *relating to* an act under color of federal office may be removed," Congress "broadened federal officer removal to actions, not just *causally* connected, but alternatively *connected* or *associated*, with acts under color of federal office." *Id*.

Thus, Tyson must demonstrate only that Plaintiff's claims are "connected or associated with an act under color of federal office." *Id*. at 296; *see also Sawyer v.*

*Foster Wheeler LLC*, 860 F.3d 249, 258 (4th Cir. 2017) (same); *Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 813 (3d Cir. 2016) (same).

Plaintiff's claims easily satisfy the "minimal 'causal connection'" required by Section 1442(a). *Latiolais*, 951 F.3d at 295 (quoting *Willingham v. Morgan*, 395 U.S. 402, 409 (1969), and *Jefferson Cnty.*, 527 U.S. at 432-33). Again, Plaintiff seems to accept that if Mr. Fernandez had contracted COVID after the April 28 order, then removal would be proper. Since Plaintiff incorrectly argues that Tyson was not following federal directions before then, his claims are obviously connected to the federal direction to (a) continue operations and (b) do so in compliance with CDC and OSHA guidelines. Plaintiff alleges that Mr. Fernandez contracted COVID because Tyson (a) failed to close, and (b) failed to keep the workplace safe with measures above and beyond federal directions. (Dkt. 2 ¶¶ 90-91, 100, 109, 125.) Tyson's operation under federal direction is therefore directly related to Plaintiff's claim of workplace injury.

C.      **Tyson has colorable federal defenses.**

Tyson has "colorable federal defense[s] to [Plaintiff's] claims" (*Jacks*, 701 F.3d at 1230) under both the express preemption provision of the FMIA and conflict preemption based on the Executive Branch's directives.[11]

**Federal Meat Inspection Act.** The FMIA expressly preempts any attempt by the states to impose regulations that are "in addition to, or different than" those prescribed under the Act:

> Requirements within the scope of this [Act] with respect to premises, facilities and operations of any establishment . . . which are in addition to, or different than those made under this [Act] may not be imposed by any State . . . .

21 U.S.C. § 678. This provision "sweeps widely" and "prevents a State from imposing any additional or different—even if non-conflicting—requirements that fall within

---

[11] The amicus brief from Public Citizen is perplexing in its total failure to address preemption under the FMIA. Federal officer removal requires a colorable federal defense, and preemption under the FMIA satisfies that requirement. Thus, Public Citizen cannot credibly maintain that removal is improper for absence of a colorable federal defense without addressing FMIA preemption.

the scope of the Act and concern a slaughterhouse's facilities or operations." *Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 459-60 (2012).

Significantly, whether a requirement falls "within the scope of" the FMIA—and is therefore preempted—does not depend on whether the Department of Agriculture has adopted or rejected the requirement. That is "irrelevant," the Supreme Court has noted, "because the FMIA's preemption clause covers not just conflicting, but also different or additional state requirements." *Harris*, 565 U.S. at 461. Instead, the question is whether the Department of Agriculture *could have adopted* the requirement: If the Department "could issue regulations under the FMIA . . . mandating" the requirement at issue, then the state's requirement is preempted. *Id.* at 466.

There is no question that the Department of Agriculture "could issue regulations" addressing infectious diseases within meat processing facilities. It already has. FSIS has promulgated hundreds of pages of federal regulations addressing meat-processing facilities and operations, including the control of infectious diseases. For example, FSIS has promulgated:

- **A "disease control" regulation** providing that "[a]ny person who has or appears to have an infectious disease . . . must be excluded from any operations which could result in product adulteration and the creation of insanitary conditions until the condition is corrected." 9 C.F.R. § 416.5(c).

- **Personal protective equipment regulations** requiring "[a]prons, frocks, and other outer clothing worn by persons who handle product," as well as detailed sanitation and hygiene regulations for things such as "hand rinsing facilities must have a continuous flow of water" for onsite poultry inspectors. *Id.* §§ 416.5(b), 381.36(f)(1)(vi).

Plaintiff alleges that Tyson failed to implement various measures that he alleges would have provided protection to employees. (Dkt. 2 ¶ 109(a)-(cc).) Tyson

vigorously disputes those allegations; it implemented extensive protective measures. But for purposes of removal, the crucial, dispositive point is this: the alleged failings Plaintiff pleads are "in addition to, or different than," the requirements that FSIS has imposed regarding employee hygiene and infectious disease—and therefore are preempted under the express terms of 21 U.S.C. § 678.

**The well-pleaded complaint rule does not apply.** Plaintiff argues that the FMIA's preemption provision does not apply because his claims are "common law . . . personal injury or workers' compensation claim[s]." [Mot. 8] But federal preemption always displaces some other body of law that a claimant says applies. To the extent Plaintiff is making some sort of "well pleaded complaint" argument, the well-pleaded complaint rule does not apply to federal officer removal. *See Jefferson Cty.*, 527 U.S. at 431. The "non-federal cast of the complaint" is irrelevant so long as "the defense depends on federal law." *Id.*

Plaintiff also asserts that the FMIA only regulates animals, not people, essentially attacking preemption on the merits. [Mot. 8] As an initial matter, Plaintiff misunderstands the removal threshold. Again, a defendant need only raise a "colorable" federal defense and need not "win his case before he can have it removed." *Jefferson Cty*, 527 U.S. at 431 (citation omitted). So resolution of preemption is premature. But Plaintiff is wrong on the merits. The FMIA absolutely regulates and protects people. Its regulation of "sanitary conditions" (21 U.S.C. § 608) applies to individuals working at meat-processing facilities, not just the animals they process. And its preemptive scope applies broadly to state laws governing the "premises, facilities and operations" of meat-processing companies. 21 U.S.C. § 678. Preemption applies wherever Plaintiff seeks to impose, as a matter of state law, different requirements for meat-processing employees than those adopted by the Department of Agriculture.

Plaintiff is similarly incorrect to assert that the FMIA can never preempt "common law" "personal injury and workers' compensation cases filed and litigated in state courts on behalf of meatpacking workers injured in slaughterhouses." [Mot. 8]

The term "[r]equirements" includes tort duties: Because "common-law liability is 'premised on the existence of a legal duty,'" "a tort judgment therefore establishes that the defendant has violated a state-law obligation" and is a "requirement" for preemption purposes. *Riegel v. Medtronic, Inc.*, 552 U.S. 312, 324 (2008).

And while the Supreme Court has noted that "state laws of general application (workplace safety regulations, building codes, etc.) will *usually* apply to slaughterhouses," 565 U.S. at 467 n.10 (emphasis added), that is because most such laws do not fall "within the scope of [the FMIA]." 21 U.S.C. § 678. But here, employee sanitation—and infectious diseases in particular—are *squarely* within the FMIA's scope, as evidenced by the FSIS's comprehensive regulation of the subject.

At the very least, everything Tyson has asserted regarding preemption is well beyond "colorable," and that suffices for obtaining a federal forum.[12]

**Conflict Preemption.** At federal direction, Tyson was (and is) required to continue operating its meat and poultry processing facilities—including the Waterloo facility—consistent with the CDC's and OSHA's guidance. Those directives preempt any attempt by the states to strike a different policy balance between securing the national food supply and stemming the spread of COVID-19.

It is "simply implausible that Congress would have gone to such lengths to empower the President if it had been willing to compromise his effectiveness by deference to every provision of state [law] that might, if enforced, blunt the consequences of discretionary Presidential action." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 376 (2000). The President's decisions "represent[] a national response to a specific problem of 'truly national' concern." *Rancho Viejo, LLC v. Norton*, 323 F.3d 1062, 1078-79 (D.C. Cir. 2003) (quotation omitted). Because "the purpose of the [DPA]

---

[12] To the extent Plaintiff suggests—as *amicus* Public Citizen does explicitly—that Tyson's arguments will leave workers "with no avenue for seeking a remedy for injuries caused by wrongdoing" (Public Citizen at 3), that is false. As Defendants have noted in their pending motions to dismiss (Dkts. 20, 21),workplace injury claims under Iowa law must be brought before the Iowa Workers' Compensation Commissioner.

- 18 -

cannot otherwise be accomplished" while allowing states to implement their own, potentially inconsistent policy decisions for meat and poultry processor operations during the COVID-19 pandemic, "the state law must yield." *Savage v. Jones*, 225 U.S. 501, 533 (1912) (finding state inspection act preempted).[13]

Plaintiff's only response to this defense is to repeat his incorrect assertion that the President's April 28 executive order is the only relevant federal direction. [Mot. 9] As explained above, that timing argument fails in light of the "critical infrastructure" designations and other federal directions at the outset of the national emergency.

## II. The Court has federal question jurisdiction because Plaintiff's claims necessarily raise substantial and disputed issues of federal law.

This Court also has jurisdiction under 28 U.S.C. § 1331 because Plaintiff's claims (1) "necessarily" raise an issue of federal law that is (2) "actually disputed," (3) "substantial," and (4) "which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." *Grable & Sons Metal Prod., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 314 (2005); *Wullschleger v. Royal Canin U.S.A., Inc.*, 953 F.3d 519, 521 (8th Cir. 2020).

Plaintiff asserts that Tyson should not have complied with federal directions (*i.e.*, should have shut down (*see* Dkt. 2 ¶¶ 58, 60, 62-63, 79, 100); should have taken different measures than were mandated by the federal directives (*e.g.*, *id.* ¶¶ 52-53, 109, 125); and violated federal law by allegedly failing to take certain precautions (*e.g.*, *id.* ¶¶ 109(aa)-(bb), 125(aa)-(bb))). Those issues directly implicate the "uniquely federal interest" in "civil liabilities" arising from the government's defense priorities

---

[13] The amicus brief of Public Citizen devotes substantial space (at 7-9) to the immunity provision of the DPA at 50 U.S.C. § 4557, arguing that, despite the DPA's plain language, its immunity provision only applies to contract claims and not tort claims. Those arguments miss the point of the preemption question and also inappropriately seek merits-based resolution at this stage, as opposed to an assessment of whether a federal defense is colorable for purposes of removal. The preemption question is most squarely presented with a plant shutdown—in a state of national emergency, the President invokes the DPA and orders continued operations overseen by federal authorities whereas (as Plaintiff asserts) state tort law requires a shutdown. That is a clear conflict, and it is certainly colorable to suggest that federal law will be supreme given, among other things, the Supremacy Clause. And that weighty question is appropriately answered based upon the provisions of the Constitution and federal statutes, not the glib citation of a Q&A on a website somewhere (Public Citizen at 9).

determinations, *Boyle v. United Techs. Corp.*, 487 U.S. 500, 506–07 (1988), and there is accordingly a "clear interest" in "the availability of a federal forum" to address them, *Grable*, 545 U.S. at 319. Further, because Plaintiff "elected to premise these . . . claims on violations and interpretations of federal law" (*see* Dkt. 2 ¶¶ 109(aa)-(bb), 125(aa)-(bb)), those claims are removable. *Wullschleger*, 953 F.3d at 521.

Invoking the well-pleaded complaint rule, Plaintiff argues that his "causes of action are made entirely in terms of state law—specifically, for Iowa common law negligence and fraudulent misrepresentation." [Mot. 9] But "simply because they appea[r] in state raiment" does not rule out removal under *Grable*, *see Grable*, 545 U.S. at 314; a "federal cause of action" is a "sufficient condition for federal-question jurisdiction," not a "necessary one," *id.* at 317. In some unique cases, "a federal court ought to be able to hear claims recognized under state law that nonetheless turn on substantial questions of federal law, and thus justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues." *Id.* at 312.

Multiple federal issues are plainly raised by the Petition (*e.g.*, Dkt. 2 ¶¶ 39, 43, 47, 81), and they permeate every aspect of Plaintiff's claims. (*E.g.*, *id.* ¶¶ 51-52 (criticizing Tyson's alleged failure to provide masks in accordance with "CDC" guidance); 109(aa) (alleging the defendants failed to abide by "Federal rules, regulations, and guidance").) According to Plaintiff, "[n]either President Trump nor Secretary Purdue mandated Tyson to keep the Waterloo Facility open." [Mot. 3] That view ignores federally designated "critical infrastructure" and the directions Tyson received to continue operating; how Tyson followed those federal directions is an issue of federal law for a federal court. *See Scrogin v. Rolls-Royce Corp.*, No. 3:10cv442 (WWE), 2010 WL 3547706, at *3 (D. Conn. Aug. 16, 2010); *McMahon v. Presidential Airways, Inc.*, 410 F. Supp. 2d 1189, 1201–02 (M.D. Fla. 2006).

## CONCLUSION

For the foregoing reasons, Tyson respectfully submits that the motion to remand should be denied.

/s/ Kevin J. Driscoll
                                    Kevin J. Driscoll    AT0002245
                                    **FINLEY LAW FIRM, P.C.**
                                    699 Walnut Street, Suite 1700
                                    Des Moines, Iowa 50309
                                    Telephone: 515-288-0145
                                    Facsimile: 515-288-2724
                                    Email: kdriscoll@finleylaw.com

                                    Christopher S. Coleman
                                    (Admitted *pro hac vice*)
                                    **PERKINS COIE LLP**
                                    2901 N. Central Avenue, Suite 2000
                                    Phoenix, Arizona 85012
                                    Telephone: 602.351.8000
                                    Facsimile: 602.648.7000
                                    Email: CColeman@perkinscoie.com

                                    Mary Gaston
                                    (Admitted *pro hac vice*)
                                    **PERKINS COIE LLP**
                                    1201 Third Avenue, Suite 4900
                                    Seattle, Washington 98101-3099
                                    Telephone: 206.359.8000
                                    Facsimile: 206.359.9000
                                    Email: MGaston@perkinscoie.com

                                    **ATTORNEYS FOR DEFENDANTS**

CERTIFICATE OF SERVICE

This is to certify that, on November 16, 2020, a true and correct copy of the foregoing document was served upon all counsel of record via the Court's CM/ECF system as follows:

Thomas P. Frerichs
**Frerichs Law Office, P.C.**
106 E. 4th Street, P. O. Box 328
Waterloo, Iowa 50704-0328
319.236.7204 / 319.236.7206 (fax)
tfrerichs@frerichslaw.com

John J. Rausch
**Rausch Law Firm, PLLC**
3909 University Ave., P. O. Box 905
Waterloo, Iowa 50704-0905
319.233.35557 / 319.233.3558 (fax)
rauschlawfirm@dybb.com

Mel C. Orchard, III
G. Bryan Ulmer, III
Gabriel Phillips
**The Spence Law Firm, LLC**
15 S. Jackson Street
P. O. Box 548
Jackson, Wyoming 83001
307.337.1283 / 307.337.3835 (fax)
orchard@spencelawyers.com
ulmer@spencelawyers.com
phillips@spencelawyers.com
*Attorneys for the Plaintiffs*

Jay M. Smith
Smith & McElwain Law Office
530 Frances Building, 505 Fifth Street
P.O. Box 1194
Sioux City, IA  51102
Phone:  712-255-8094
Fax:  712-255-3825
smitmcel@aol.com

Adam R. Pulver, *pro hac vice*

PUBLIC CITIZEN LITIGATION GROUP
1600 20th Street NW
Washington, DC  20009
Phone:  (202) 588-1000
apulver@citizen.org
*Attorneys for Amicus Public Citizen*

/s/ Kevin J. Driscoll

150127064.2