**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION**

OSCAR FERNANDEZ, Individually and
as Administrator of the Estate of Isidro
Fernandez,

               Plaintiff,

vs.

TYSON FOODS, INC., TYSON FRESH
MEATS, INC., JOHN H. TYSON,
NOEL W. WHITE, DEAN BANKS,
STEPHEN R. STOUFFER, TOM
BROWER, TOM HART, CODY
BRUSTKERN, BRET TAPKEN, and
JOHN CASEY,

               Defendants.

No.  20-CV-2079-LRR

**ORDER**

_____

*TABLE OF CONTENTS*

I.      **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

II.     **BACKGROUND OF THE CASE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

     A.     *General Procedural History* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
     B.     *Causes of Action in the Petition* . . . . . . . . . . . . . . . . . . . . . . . . . .3
     C.     *Factual Allegations in the Petition* . . . . . . . . . . . . . . . . . . . . . . . .8

III.    **NOTICE OF REMOVAL** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

IV.    **MOTION TO REMAND** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

     A.     *Parties' Arguments* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13
     B.     *Applicable Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18
         1.     *Federal Jurisdiction* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
         2.     *Removal to Federal Court* . . . . . . . . . . . . . . . . . . . . . . . . . .19
         3.     *Removal Based on Federal Officer Statute* . . . . . . . . . . . . . . .20
     C.     *Application* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23

    1.    *Federal Officer Removal* . . . . . . . . . . . . . . . . . . . . . . . . . . . .*23*
          a.    *Acted under the direction of a federal officer* . . . . . . . .*23*
          b.    *Causal connection* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
          c.    *Colorable federal defense* . . . . . . . . . . . . . . . . . . . . . .*26*
          d.    *Summary* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
    2.    *Removal Based on a Federal Question* . . . . . . . . . . . . . . . . .*27*
    3.    *Attorney Fees and Costs* . . . . . . . . . . . . . . . . . . . . . . . . . . .*28*

V.    *CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

## I.  INTRODUCTION

The matter before the court is Plaintiff Oscar Fernandez's Motion to Remand ("Motion") (docket no. 22).

## II.  BACKGROUND OF THE CASE

### A.  General Procedural History

On August 5, 2020, Plaintiff filed a "Petition at Law and Demand for Jury Trial" ("Petition") (docket no. 2) in the Iowa District Court for Black Hawk County.  On October 2, 2020, Defendants Tyson Foods, Inc. and Tyson Fresh Meats, Inc. (collectively, "Tyson") filed a Notice of Removal (docket no. 1), bringing the case before this court.[1]  On November 2, 2020, Plaintiff filed the Motion.  On November 10, 2020,

---

[1]  It is "the settled rule that removal under 28 U.S.C. § 1442 can be effected by any defendant in an action, with or without the consent of co-defendants." *Alsup v. 3-Day Blinds, Inc.*, 435 F.Supp.2d 838, 842 (S.D. Ill. 2006); *see also Akin v. Ashland Chemical Co.*, 156 F.3d 1030, 1034 (10th Cir. 1998) (providing that 28 U.S.C. § 1442(a)(1) provides a statutory exception that "allows a federal officer [or any person acting under that officer] independently to remove a case to federal court even though that officer is only one of several named defendants"); *Ely Valley Mines, Inc. v. Hartford Acc. & Indem. Co.*, 644 F.2d 1310, 1315 (9th Cir. 1981) (finding that § 1442 "represents an exception to the general rule . . . that all defendants must join in the removal petiton"); *Citrano v. John Crane-Houdaille, Inc.*, 1 F.Supp.3d 459, 465 (D. Md. 2014) ("Unlike removal under § 1441, under § 1442(a) the other defendants need not join in or consent for removal to be proper.").  Here, Tyson is removing this case under 28 U.S.C. § 1442(a).  *See* Notice of Removal at 1.  Accordingly, this action may be removed without consent from the other Defendants.  Additionally, as set forth in the Notice of Removal, Defendants John Tyson, Noel White, Dean Banks, Stephen Stouffer, Tom Brower and

2

a "Brief of Amicus Curiae Public Citizen in Support of Plaintiff's Motion to Remand" (docket no. 28) was filed. On November 16, 2020, Tyson filed a Resistance (docket no. 31).

On November 11, 2020, Plaintiff filed the First Amended Complaint (docket no. 29), which among other things, dismissed Defendants Mary A. Oleksiuk, Elizabeth Croston, Hamdija Beganovic, James Hook, Ramiz Muheljic, Missia Abad Bernal and John/Jane Does 1-10. Additionally, Defendants Cody Brustkern, John Casey and Bret Tapken were added in the First Amended Complaint.

### B. Causes of Action Alleged in the Petition

Even though Plaintiff has filed a First Amended Complaint in this case, for purposes of the Motion, the court considers the complaint, or in this instance, the Petition that existed at the time that the Notice of Removal was filed. *See Scarlott v. Nissan North America, Inc.*, 771 F.3d 883, 888 n.2 (5th Cir. 2014) (citing *Boelens v. Redman Homes, Inc.*, 759 F.2d 504, 507 (5th Cir. 1985); *see also Harper v. AutoAlliance Intern., Inc.*, 392 F.3d 195, 210 (6th Cir. 2004) ("The existence of subject matter jurisdiction is determined by examining the complaint as it existed at the time of removal"); *United Farm Bureau Mut. Ins. Co., Inc. v. Metropolitan Human Relations Commission*, 24 F.3d 1008, 1014 (7th Cir. 1994) ("It is a fundamental principle of law that whether subject matter jurisdiction exists is a question answered by looking to the complaint as it existed at the time the petition for removal was filed") (quotation omitted); *Salton v. Polyock*, 764 F.Supp.2d 1033, 1035 (N.D. Iowa 2011) ("[A] fundamental principle of removal jurisdiction is that whether subject matter jurisdiction exists is a question answered by looking to the complaint as it existed at the time the petition for removal was filed"); *Virginia Gay Hospital, Inc. v. Amerigroup Iowa, Inc.*, No. C18-112-LTS, 2019 WL 5483827, at *2 (N.D. Iowa Feb. 15, 2019) (same).

---

Tom Hart "confirm that they consent to this case being removed." *See* Notice of Removal at 16.

3

In the first cause of action in the Petition Plaintiff alleges fraudulent misrepresentation and vicarious liability and seeks punitive damages against Tyson. *See* Petition ¶¶ 89-103. In the second cause of action, Plaintiff alleges gross negligence and seeks punitive damages against Defendants John H. Tyson, Noel W. White, Dean Banks, Stephen R. Stouffer and Tom Brower (collectively, "Executive Defendants"). *See id.* ¶¶ 104-119. In the third cause of action, Plaintiff alleges gross negligence and fraudulent misrepresentation and seeks punitive damages against Defendants Tom Hart, Bret Tapken, Cody Brustkern and John Casey (collectively, "Supervisory Defendants").[2] *Id.* ¶¶ 120-141.

Specifically, Plaintiff alleges that Tyson "made numerous false representations" to Plaintiff's decedent at the Waterloo facility and "falsely represented" that: (1) COVID-19 had not been detected at the facility; (2) COVID-19 was not spreading through the facility; (3) worker absenteeism was not related to COVID-19; (4) sick workers were not permitted to enter the facility; (5) workers from other Tyson facilities that were shut down due to COVID-19 outbreaks were not permitted to enter the Waterloo facility; (6) sick or symptomatic workers would be sent home immediately and would not be permitted to return until cleared by health officials; (7) workers would be notified if they had been in close contact with an infected co-worker; (8) the workers' health and safety was a top priority for Tyson; (9) safety measures implemented at the Waterloo facility would prevent or mitigate the spread of COVID-19 and protect workers from infection; (10) the Waterloo facility needed to stay open in order to avoid meat shortages in the United States; and (11) the Waterloo facility was a safe work environment. *Id.* ¶¶ 90-91(a)-(k). Plaintiff alleges that Tyson knew that such representations were false and

---

[2] The Defendants listed as Supervisory Defendants corresponds to the named Defendants in the First Amended Complaint. Additionally, the fourth cause of action in the Petition is no longer viable as the claims are against Elizabeth Croston, whom Plaintiff voluntarily dismissed from this action. *See* Petition ¶¶ 142-150; First Amended Complaint.

material.  *Id*.  ¶¶ 92-93.  Further, Plaintiff alleges that Tyson made the false representations to induce Plaintiff's decedent to continue working despite the uncontrolled COVID-19 outbreak in the Waterloo facility.  *Id*. ¶ 94.  Plaintiff alleges that Plaintiff's decedent "accepted and relied" on Tyson's representations and Plaintiff's decedent was induced to continue working at the Waterloo facility.  *Id*. ¶¶ 95-96.  Plaintiff also alleges that Tyson is "vicariously liable for the culpable acts and omissions committed by all of its agents acting within the course and scope of their agency," including the Executive Defendants and Supervisory Defendants.  *Id*. ¶ 98.

Plaintiff alleges that the Executive Defendants "had a duty to exercise reasonable care to prevent injuries to [Plaintiff's decedent]" and breached their duty by the following acts and omissions: (1) failing to develop or implement worksite assessments to identify COVID-19 risks and prevention strategies for the Waterloo facility; (2) failing to develop or implement testing and workplace contact tracing of COVID-19 positive workers at the Waterloo facility; (3) failing to develop and implement a comprehensive screening and monitoring strategy aimed at preventing the introduction of COVID-19 into the worksite, including: a program to effectively screen workers before entry into the workplace; return to work criteria for workers infected with or exposed to COVID-19 and criteria for exclusion of sick or symptomatic workers; (4) allowing or encouraging sick or symptomatic workers to enter or remain in the workplace; (5) failing to promptly isolate and send sick or symptomatic workers home; (6) failing to configure communal work environments so that workers were spaced at least six feet apart; (7) failing to modify the alignment of workstations, including those along processing lines, so that workers did not face each other; (8) failing to install physical barriers to separate or shield workers from each other; (9) failing to develop, implement or enforce appropriate cleaning, sanitation and disinfection practices to reduce exposure or shield workers from COVID-19 at the Waterloo facility; (10) failing to provide workers with appropriate personal protective equipment, including face coverings; (11) failing to require employees to wear face coverings; (12) failing to provide adequate hand washing or hand sanitizing stations

throughout the Waterloo facility; (13) failing to slow production in order to operate with a reduced work force; (14) failing to develop, implement or enforce engineering or administrative controls to promote social distancing; (15) failing to modify, develop, implement, promote and educate workers, including workers with limited English language abilities, regarding revised sick leave, attendance or incentive policies to ensure that sick or symptomatic workers stay home; (16) failing to ensure that workers, including workers with limited English language abilities, were aware of, or understood modified sick leave, attendance or incentive policies; (17) failing to ensure adequate ventilation in work areas to minimize workers' potential exposure to COVID-19 and failing to minimize air flow from fans blowing from one worker directly onto another worker; (18) failing to establish, implement, promote and enforce a system for workers, including those with limited English language abilities, to alert supervisors if they were experiencing signs or symptoms of COVID-19 or if they had recent contact with a suspected confirmed COVID-19 case; (19) failing to inform workers, including those with limited English language abilities, who had contact with a suspected or confirmed COVID-19 case; (20) failing to educate and train workers and supervisors, including workers with limited English language abilities, on how to reduce the spread of COVID-19 and prevent exposure to COVID-19; (21) failing to encourage or require workers to stay home when sick; (22) failing to inform or warn workers that individuals suspected or known to have been exposed to COVID-19 at other Tyson facilities, including the Columbus Junction facility, were permitted to enter the Waterloo facility without adequately quarantining or testing negative for COVID-19 prior to entry; (23) operating the Waterloo facility in a manner that resulted in more than 1,000 infected workers and five deaths; (24) making false and fraudulent misrepresentations on behalf of Tyson; (25) failing to provide and maintain a safe work environment; (26) failing to take reasonable precautions to protect workers from foreseeable dangers; (27) failing to abide by state and federal regulations and guidance; (28) failing to abide by appropriate OSHA standards and guidance; and (29) failing to exercise reasonable care. *Id*. ¶¶ 108-109(a)-(cc). Based on the foregoing,

6

Plaintiff alleges that the Executive Defendants' "acts and omissions were grossly negligent, reckless, intentional, and constituted willful and wanton disregard for the safety of workers." *Id*. ¶ 110. Plaintiff alleges that "[t]he Executive Defendants knew of the danger to be apprehended" and "knew or should have known that their conduct was probable to cause employees to become seriously ill or die." *Id*. ¶¶ 112-113.

Plaintiff alleges that the Supervisory Defendants "had a duty to exercise reasonable care to prevent injuries to [Plaintiff's decedent]" and breached their duty through acts and omissions identical to the acts and omissions alleged against the Executive Defendants. *Id*. ¶¶ 124-125(a)-(cc); *compare id*. ¶ 109(a)-(cc) *with id*. ¶ 125(a)-(cc). Plaintiff alleges that the Supervisory Defendants' "acts and omissions were grossly negligent, reckless, intentional, and constituted willful and wanton disregard for the safety of workers." *Id*. ¶ 126. Plaintiff alleges that the Supervisory Defendants "consciously failed to avoid the danger," even though they "recognized the danger of a COVID-19 outbreak at the facility and failed to take sufficient precautions to avoid an outbreak." *Id*. ¶ 130. Plaintiff also alleges that:

> The Supervisory Defendants made fraudulent misrepresentations to the Waterloo workforce. They made false statements concerning the presence and spread of COVID-19 at the Waterloo [f]acility, the importance of protecting and keeping employees safe, the breadth and efficacy of safety measures implemented at the facility, and the importance of keeping the facility open. The Supervisory Defendants knew these representations were false; they knew or should have known it was wrong to make such false representations, and they intended to deceive and induce Waterloo employees, including [Plaintiff's decedent] to continue working despite the danger of COVID-19.

*Id*. ¶ 132. Specifically, Plaintiff alleges that the Supervisory Defendants "falsely represented" to Plaintiff's decedent that: (1) COVID-19 had not been detected at the facility; (2) COVID-19 was not spreading through the facility; (3) worker absenteeism was not related to COVID-19; (4) sick workers were not permitted to enter the facility; (5) workers from other Tyson facilities that had shut down due to COVID-19 outbreaks

were not permitted to enter the Waterloo facility; (6) sick or symptomatic workers would be sent home immediately and would not be permitted to return until cleared by health officials; (7) workers would be notified if they had been in close contact with an infected co-worker; (8) the workers' health and safety was a top priority for Tyson; (9) safety measures implemented at the Waterloo facility would prevent the spread of COVID-19 and protect the workers from infection; (10) the Waterloo facility needed to stay open in order to avoid meat shortages in the United States; and (11) the Waterloo facility was a safe work environment. *Id*. ¶ 133(a)-(k). Further, Plaintiff alleges that the Supervisory Defendants knew that such representations were false and material. *Id*. ¶¶ 134-135. Plaintiff alleges that the Supervisory Defendants made the false representations to induce Plaintiff's decedent to continue working despite the uncontrolled COVID-19 outbreak in the Waterloo facility, Plaintiff's decedent "accepted and relied" on the Supervisory Defendants' representations and Plaintiff's decedent was induced to continue working at the Waterloo facility. *Id*. ¶¶ 136-138.

Tyson requests oral argument. The court finds that oral argument is unnecessary. Therefore, Tyson's request is denied. The matter is fully submitted and ready for decision.

## C. *Factual Allegations in the Petition*

On March 13, 2020, President Donald Trump declared a national emergency due to the coronavirus pandemic. *Id*. ¶ 43. Also, on or about March 13, 2020, Tyson "suspended all [United States] commercial business travel, [forbade] all non-essential visitors from entering Tyson offices and facilities, and mandated that all non-critical employees at its [United States] corporate office locations work remotely." *Id*. ¶ 44. On March 17, 2020, Governor Kim Reynolds declared a public health disaster emergency for the State of Iowa due to the coronavirus pandemic. *Id*. ¶ 45.

Tyson's facility in Waterloo, Iowa, is its "largest pork plant in the United States." *Id*. ¶ 48. The facility employs approximately 2,800 workers and processes approximately 19,500 hogs per day. *Id*. By late-March or early April, the Executive Defendants,

8

Supervisory Defendants and other Tyson managers were aware that COVID-19 was spreading throughout the Waterloo facility. *Id.* ¶ 50. On April 3, 2020, the CDC recommended that all Americans wear face coverings in public to prevent the spread of COVID-19. *Id.* ¶ 51. Tyson did not provide its workers at the Waterloo facility with sufficient face coverings or other personal protective equipment. *Id.* ¶ 52. Tyson also "did not implement or enforce sufficient social distancing measures at the Waterloo [f]acility." *Id.* ¶ 53.

On or about April 6, 2020, after more than two dozen employees tested positive for COVID-19, Tyson temporarily suspended operations at the Columbus Junction, Iowa, facility. *Id.* ¶ 54. Also, on or about April 6, 2020, Tyson installed temperature-check stations at the entrances to the Waterloo facility. *Id.* ¶ 55.

On April 10, 2020, Black Hawk County Sheriff Tony Thompson and Black Hawk County health officials visited Tyson's Waterloo facility. *Id.* ¶ 56. According to Sheriff Thompson, working conditions at the Waterloo facility were poor, with workers "crowded elbow to elbow" and "most without face coverings." *Id.* ¶ 57. "Sheriff Thompson and other local officials lobbied Tyson to close the plant, but [Tyson] refused." *Id.* ¶ 58. On April 12, 2020, approximately two-dozen Tyson employees were seen at the emergency department at MercyOne Waterloo Medical Center. *Id.* ¶ 59.

On April 14, 2020, Black Hawk County officials asked Tyson to temporarily shut down the Waterloo facility. *Id.* ¶ 60. Tyson did not shut the facility down. *Id.* On April 16, 2020, Tyson publicly denied a COVID-19 outbreak at the Waterloo facility. *Id.* ¶ 61. On or about April 17, 2020, "twenty local elected officials sent a letter to Tyson . . . imploring the company to take steps 'to ensure the safety and well-being of Tyson's valuable employees and our community' and to 'voluntarily cease operations on a temporary basis at [the] Waterloo [f]acility so that appropriate cleaning and mitigation strategies [could] take place.'" *Id.* ¶ 62 (first alteration in original). Further, the letter stated that "at least one Tyson employee had informed Waterloo health care providers that he or she had transferred to the Waterloo [f]acility from Tyson's Columbus Junction

9

plant, which had closed due to a COVID-19 outbreak" and "workers did not have sufficient personal protective equipment; social distancing measures were not being implemented or enforced on the plant floor or in employee locker rooms; nurses at the Waterloo [f]acility lacked sufficient medical supplies and were unable to accurately conduct temperature checks; and because of language barriers, non-English speaking employees mistakenly believed they could return to work while sick." *Id*.

After the Columbus Junction facility was shut down due to a COVID-19 outbreak, Tyson transferred workers from Columbus Junction to the Waterloo facility. *Id*. ¶ 64. "Tyson failed to test or adequately quarantine workers from the Columbus Junction [facility] before allowing them to enter the Waterloo [f]acility." *Id*. ¶ 65. Also, Tyson allowed subcontractors from facilities that had shut down due to COVID-19 outbreaks to enter the Waterloo facility. *Id*. ¶ 66. "Tyson did not test or adequately quarantine these subcontractors before allowing them to enter and move about the Waterloo [f]acility." *Id*. ¶ 67. Tyson "permitted or encouraged sick and symptomatic employees and asymptomatic employees known or suspected to have been exposed to COVID-19 to continue working at the Waterloo [f]acility." *Id*. ¶ 68. "At least one worker at the facility vomited on the production line and management allowed him to continue working and return to work the next day." *Id*. Supervisors and managers at the Waterloo facility told employees that their co-workers were sick with the flu, not COVID-19, and told them not to discuss COVID-19 at work. *Id*. ¶ 70.

"[H]igh-level Tyson executives began lobbying the White House for COVID-19 related liability protections as early as March and continued their lobbying efforts throughout April." *Id*. ¶ 71. Tyson executives also lobbied members of Congress for COVID-19-related liability protections. *Id*. ¶ 72. Further, Tyson executives lobbied Governor Reynolds for COVID-19-related liability protections. *Id*. ¶ 73.

On April 20, 2020, Tyson began shutting down operations at its Waterloo facility due to the lack of a healthy labor force, but the facility did not shut down until April 22, 2020, after it had processed the remaining hogs in its cooler. *Id*. ¶ 76. On April 22,

2020, Tyson indefinitely suspended operations at the Waterloo facility. *Id.* ¶ 77. On April 28, 2020, President Trump "signed an executive order classifying meat processing plants as essential infrastructure that must remain open," in order "to avoid risk to the nation's food supply." *Id.* ¶ 81.

The Black Hawk County Health Department recorded more than 1,000 COVID-19 infections among Tyson employees, which is more than one-third of the Waterloo facility workforce. *Id.* ¶ 83. Five workers from the Waterloo facility died. *Id.* On April 26, 2020, Isidro Fernandez died from complications due to COVID-19. *Id.* ¶ 3.

### III. NOTICE OF REMOVAL

In the Notice of Removal, Tyson asserts that this court has subject matter jurisdiction because Plaintiff's Petition "challenges actions taken by Tyson at the direction of a federal officer." Notice of Removal at 1. Tyson reads Plaintiff's Petition to argue that, "in effect . . . Tyson should have shut down its facility in Waterloo, Iowa during the COVID-19 pandemic or operated it differently." *Id.* at 2. Tyson maintains, however, that the Waterloo facility "was operating as part of the federally designated 'critical infrastructure' at the direction of, and under the supervision of, the U.S. Department of Homeland Security and the U.S. Department of Agriculture." *Id.* Further, Tyson asserts that "[t]he President and the Secretary of Agriculture provided detailed instruction for meat-processing facilities to continue operating[.]" *Id.* at 3. Tyson emphasizes an Executive Order, dated April 28, 2020, which states that "'[i]t is important that processors of beef, pork, and poultry . . . in the food supply chain continue operating and fulfilling orders to ensure a continued supply of protein for Americans' and . . . that any 'closures [of such facilities] threaten the continued functioning of the national meat and poultry supply chain' and 'undermin[e] critical infrastructure during the national emergency.'" *Id.* (alterations in original) (quoting *Executive Order on Delegating Authority under the DPA with respect to Food Supply Chain Resources during the National Emergency caused by the Outbreak of COVID-19*, 2020 WL 2060381, at *1 (Apr. 28, 2020)). Tyson maintains that, "[b]ecause [it] "continued to operate the

Waterloo facility following federal critical infrastructure directions and supervision from federal officers, including directives from the President and Secretary of Agriculture and guidance from the CDC and OSHA, federal court is the proper forum for resolving this case." *Id*.

More specifically, Tyson offers the following timeline in support of its position that it was acting under the direction of a federal officer:

> On March 13, 2020, the President declared "a National Emergency in response to the COVID-19 outbreak. . . ." Soon after, on March 16, [2020] the President issued "Coronavirus Guidelines" emphasizing that employees in "critical infrastructure industry[ies]"—including companies like Tyson that are essential to maintaining food-supply chains and ensuring the continued health and safety of all Americans—have a 'special responsibility' and 'should follow CDC guidance to protect [employees'] health at work.'" Exec. Office of Pres., *The President's Coronavirus Guidelines for America* at 2 (Mar. 16, 2020).

*Id*. at 4 (second and third alteration in original). Tyson maintains that, "from the time of President Trump's disaster declaration on March 13[, 2020], Tyson was in close contact with federal officials regarding continued operations as critical infrastructure." *Id*. at 5.

Tyson emphasizes that, on April 28, 2020, President Trump issued an executive order that "expressly invoked his authority under the Defense Production Act ("DPA") and again directed that it was federal policy that meat and poultry processing companies continue operating subject to the supervision of the Secretary of Agriculture." *Id*. at 6-7. Further, Tyson notes that, on May 5, 2020, Secretary of Agriculture Sonny Perdue issued a letter to meat and poultry processing companies "directing them to continue operating pursuant to federal directives[.]" *Id*. at 7. Additionally, Tyson asserts that, on May 18, 2020, the United States Department of Agriculture ("USDA") and United States Food and Drug Administration ("FDA") entered into a memorandum of understanding explaining each Department's role in utilizing the DPA to regulate food producers during the COVID-19 outbreak. *Id*. at 8. Tyson points out that the

memorandum stated that the USDA "retained exclusive delegated authority under the DPA to issue orders regarding domestic food producers." *Id.* (quotation omitted). Tyson maintains that its actions to keep operating the Waterloo facility stem from "the authority, orders, detailed regulation, and supervision of the President and U.S. Departments of Homeland Security and Agriculture" and, therefore, it was "'acting under' federal officers" and is "entitled to have this case heard in federal court." *Id.* at 10.

Further, in the Notice of Removal, Tyson asserts that "there is a direct connection between the Petition's allegations and the actions [it] took at the direction of federal officers." *Id.* Tyson frames Plaintiff's Petition as containing allegations of liability "in tort for not shutting down the Waterloo facility." *Id.* Tyson also argues that the Petition "challenges specific measures that [it] adopted or allegedly failed to adopt in response to the coronavirus" but maintains that "the measures that [it] took were at the direction of federal officers" and any such disputes are for a federal court to answer, not a state court. *Id.*

Additionally, in the Notice of Removal, Tyson asserts, that it has colorable federal defenses under the FMIA, the DPA and President Trump's April 28, 2020 Executive Order. *See id.* at 11-12.

Finally, in the Notice of Removal, Tyson contends that removal is appropriate because the court has federal question jurisdiction. *Id.* at 9. Specifically, Tyson asserts that Plaintiff's Petition necessarily raises substantial federal issues making federal jurisdiction appropriate. *See generally id.* at 12-15.

## IV.  MOTION TO REMAND

### A.  Parties' Arguments

Plaintiff argues that "[f]ederal officer removal is improper because the Notice of [Removal] does not identify any federal directive that existed at the time [Isidro] Fernandez was working for Tyson, failed to establish causation between a directive and the company's tortious conduct, and failed to raise a colorable federal defense." Plaintiff's Brief in Support of Motion to Remand ("Plaintiff's Brief") (docket no. 22-1)

13

at 3. Plaintiff's reading of Tyson's Notice of Removal is that Tyson primarily relies on President Trump's April 28, 2020 Executive Order, instructing meat processing plants to remain open, to support its theory for federal officer removal. *See id*. at 4. Plaintiff asserts that such reliance is "insufficient for federal officer removal." *Id*.

Specifically, Plaintiff argues that he "did not sue Tyson for actions taken after [Isidro] Fernandez died on April 26[, 2020]," and, therefore, it is "irrelevant whether or not the company was acting under a federal officer as of April 28[, 2020]." *Id*. Plaintiff also argues that "Tyson's vague assertion that it 'was in close contact with federal officials regarding continued operations as critical infrastructure'—without explaining what this means or how it relates to [Isidro] Fernandez's claims—is an insufficient basis for federal officer jurisdiction." *Id*. at 5 (citing *Bd. of Cty. Commissioners of Boulder Cty. v. Suncor Energy (U.S.A.), Inc.*, 965 F.3d 792, 819 (10th Cir. 2020); *Mayor & City Council of Baltimore v. B.L. PLC*, 952 F.3d 452, 466 n.9 (4th Cir. 2020)). Further, Plaintiff asserts that "[c]ritical infrastructure or not, the [g]overnment did not order Tyson to make fraudulent representations to its employees, prevent the company from providing employees with personal protective equipment, prohibit the company from implementing and enforcing social distancing measures, or forbid the company from implementing basic safety measures to protect its employees." *Id*. at 5-6. Plaintiff maintains that "federal officer removal is improper because Tyson was not 'acting under' a federal officer when it needlessly and knowingly exposed [Isidro] Fernandez to COVID-19." *Id*. at 6.

Further, Plaintiff asserts that contrary to Tyson's reading of the Petition, Plaintiff "did not sue Tyson . . . for failing to shut down the [Waterloo f]acility"; instead, Plaintiff "sued Tyson and its agents for fraudulent misrepresentation and gross negligence." *Id*. Specifically, Plaintiff argues that, in the Petition, he "contends that Tyson's executives and managers violated their duty through twenty-nine acts and omissions, none of which include failing to shut down the facility." *Id*. at 7. Plaintiff concludes that "the only action that Tyson claims to have taken at the direction of a federal officer (keeping the facility open) does not serve as a basis for Plaintiff's claims," and, therefore, "Tyson has

14

failed to demonstrate that the acts for which it was sued occurred because of what it was asked to do by the [g]overnment." *Id.*

Plaintiff also argues that "Tyson does not have a colorable federal defense." *Id.* Plaintiff maintains that neither express preemption under the Federal Meat Inspection Act ("FMIA"), nor ordinary preemption under President Trump's April 28, 2020 Executive Order constitute a colorable federal defense. *See id.* Specifically, Plaintiff argues that "Tyson's assertion that FMIA preempts [his] common law fraudulent misrepresentation and personal injury claims is entirely implausible, wholly insubstantial, absurdly frivolous—and plainly made for the sole purpose of obtaining federal jurisdiction." *Id.* at 8 (relying on *Arbaugh v. Y&H Corp.*, 546 U.S. 513 n.10 (2006); *Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 297 (5th Cir. 2020)). Plaintiff maintains that FMIA "preempts [s]tates from regulating the inspection, handling, and slaughter of livestock for human consumption" but FMIA "does not preempt [s]tates from regulating other matters." *Id.* (quotation and citation omitted). Plaintiff concludes that, "[b]ecause this lawsuit does not seek to regulate Tyson's inspection, handling or slaughter of livestock, Plaintiff's common law tort claims are not preempted by the FMIA." *Id.* Finally, Plaintiff argues that preemption under President Trump's April 28, 2020 Executive Order and the DPA are not "colorable defense[s] because [Isidro] Fernandez contracted COVID-19, stopped working and died before President Trump invoked the DPA." *Id.* at 9. Plaintiff maintains that "[t]he Executive Order and DPA are wholly irrelevant to Plaintiff's claims" and "Tyson has not raised a colorable federal defense." *Id.*

Lastly, Plaintiff argues that "[r]emoval is not warranted on the basis of federal question jurisdiction." *Id.* at 9. Plaintiff maintains that the "causes of action are made entirely in terms of state law—specifically, for Iowa common law negligence and fraudulent misrepresentation" and these "common law tort claims do not create a substantial question of federal law[,]" making "removal based on federal question jurisdiction improper." *Id.* Further, Plaintiff argues that "Tyson's attempt to transform

15

this action into one arising under federal law violates the well-pleaded complaint rule." *Id*. Plaintiff also argues that, "[b]ecause [Isidro Fernandez] contracted COVID-19 and stopped working weeks before President Trump invoked the DPA, Plaintiff's claims do not depend, in any way, on the interpretation or application of the DPA. It follows, therefore, that federal question jurisdiction does not exist." *Id*. at 10. Plaintiff asserts that "reference to federal guidance and regulations does not confer federal question jurisdiction." *Id*. Plaintiff maintains that "[m]erely referencing federal regulations within the context of state law negligence claims does not confer federal question jurisdiction." *Id*. at 11. Plaintiff states that he "referenced CDC guidance and OSHA regulations merely as standards upon which to measure Defendants' negligence. Plaintiff[] do[es] not claim relief under CDC guidance or OSHA regulations, but solely under Iowa tort law." *Id*.

In response, Tyson argues that "[t]his [c]ourt has jurisdiction under the federal officer removal statute." Resistance at 14. Tyson asserts that, "[f]or removal to be proper, [it] need only show that it is 'plausible' that it was acting under the direction of federal officers[.]" *Id*. at 15 (citing *Betzner v. Boeing Co.*, 910 F.3d 1010, 1013-14 (7th Cir. 2018)).[3] Tyson maintains that it "was acting at the direction of federal officers in a time of emergency to provide the food security that the government desired." *Id*. at 16. Further, Tyson asserts that "federal officers designated Tyson and its employees as 'critical infrastructure,' and the whole point of that designation is to continue operations during an emergency, working with the Department of Homeland Security and USDA,

---

[3] Tyson overreaches with its citation to *Betzner* for the proposition that it "need only show that it is 'plausible' that it was acting under the direction of federal officers." Initially, the court notes that the citation to pages 1013-14 in *Betzner* is incorrect for Tyson's proposition. Significantly, however, in *Betzner*, the Seventh Circuit Court of Appeals did not hold that a defendant "need only show that it is plausible that the defendant was acting under the direction of federal officers"; instead, the Seventh Circuit found that "Boeing plausibly alleged that it acted under federal officers when it contracted to manufacture heavy bomber aircraft for the United States Air Force, and that it acted under the military's detailed and ongoing control." 910 F.3d at 1015.

16

the designated leader with respect to the Food and Agricultural Sector of 'critical infrastructure.'" *Id*.

Next, Tyson argues that "[t]here is sufficient causal nexus between Tyson's actions and federal directions." *Id*. at 18. Tyson notes that the federal officer removal statute was amended in 2011 and, as amended, the statute "no longer imposes a 'direct causal nexus' requirement" because Congress "'broadened federal officer removal to actions, not just causally connected, but alternatively connected or associated, with acts under color of federal office.'" *Id*. (quoting *Latiolais*, 951 F.3d at 292). Tyson asserts that it "must demonstrate only that Plaintiff's claims are connected or associated with an act under color of federal office." *Id*. (quotation omitted). Tyson argues that:

> Plaintiff's claims easily satisfy the "minimal 'causal connection'" required by Section 1442(a). . . . Since Plaintiff incorrectly argues that Tyson was not following federal directions before [President Trump's April 28, 2020 Executive Order was issued], his claims are obviously connected to the federal direction to (a) continue operations and (b) do so in compliance with CDC and OSHA guidelines. . . . Tyson's operation[s] under federal direction is therefore directly related to Plaintiff's claim of workplace injury.

*Id*. at 19.

Tyson also argues that it "has colorable federal defenses." *Id*. Tyson maintains that the FMIA preempts Plaintiff's claims. *Id*. (citing 21 U.S.C. § 678). Tyson maintains that § 678 "'sweeps widely' and 'prevents a State from imposing any additional or different—even if non-conflicting—requirements that fall within the scope of the Act and concern a slaughterhouse's facilities or operations." *Id*. at 19-20 (quoting *Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 459-60 (2012)). Specifically, Tyson argues that "the alleged failings Plaintiff pleads are 'in addition to, or different than,' the requirements that FSIS [("Food Safety and Inspection Service")] has imposed regarding employee hygiene and infectious disease—and therefore are preempted under the express terms of 21 U.S.C. § 678." *Id*. at 21. Tyson asserts that "[p]reemption applies wherever Plaintiff

seeks to impose, as a matter of state law, different requirements for meat-processing employees than those adopted by the Department of Agriculture." *Id.*

Tyson also argues that, "[a]t federal direction, Tyson was (and is) required to continue operating its meat and poultry processing facilities—including the Waterloo facility—consistent with the CDC's and OSHA's guidance." *Id.* at 22. Tyson maintains that "[t]hose directives preempt any attempt by the states to strike a different policy balance between securing the national food supply and stemming the spread of COVID-19." *Id.*

Finally, Tyson argues that "[t]he [c]ourt has federal question jurisdiction because Plaintiff's claims necessarily raise substantial and disputed issues of federal law." *Id.* at 23 (citing *Grable & Sons Metal Prod., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 314 (2005)). Tyson asserts that "[m]ultiple federal issues are plainly raised by the Petition . . . and they permeate every aspect of Plaintiff's claims." *Id.* at 24. Tyson also argues that Plaintiff ignores that it was federally designated as "critical infrastructure" and received directions "to continue operating" and "how Tyson followed those federal directions is an issue of federal law for a federal court." *Id.*

## B. Applicable Law

### 1. Federal Jurisdiction

"'Federal courts are courts of limited jurisdiction,' possessing 'only that power authorized by Constitution and statute.'" *Eckerberg v. Inter-State Studio & Publ'g Co.*, 860 F.3d 1079, 1084 (8th Cir. 2017) (quoting *Gunn v. Minton*, 568 U.S. 251, 256 (2013)). "The requirement that jurisdiction be established as a threshold matter 'spring[s] from the nature and limits of the judicial power of the United States' and is 'inflexible and without exception.'" *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998) (alteration in original) (quoting *Mansfield, C. & L. M. Ry. Co. v. Swan*, 111 U.S. 379, 382 (1884)).

### 2. *Removal to Federal Court*

"A defendant may remove a state law claim to federal court when the federal court would have had original jurisdiction if the suit originally had been filed there." *Phipps v. F.D.I.C.*, 417 F.3d 1006, 1010 (8th Cir. 2005). Original subject matter jurisdiction can be established in two ways: (1) by alleging a claim arising under federal law, *see* 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States"), or (2) by alleging diversity of citizenship between the parties, *see* 28 U.S.C. § 1332(a)(1) and (a)(2) ("The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000 . . . and is between . . . (1) citizens of different States; [or] (2) citizens of a State and citizens or subjects of a foreign state. . . .").

Generally, removal based on federal question jurisdiction is based on the "well-pleaded complaint" rule. *Phipps*, 417 F.3d at 1010. The "well-pleaded complaint" rule provides that "federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint." *Markham v. Wertin*, 861 F.3d 748, 754 (8th Cir. 2017) (quoting *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987)). "The rule also 'makes plaintiff the master of the claim,' allowing the plaintiff to 'avoid federal jurisdiction by exclusive reliance on state law.'" *Phipps*, 417 F.3d at 1010 (quoting *Caterpillar Inc.*, 482 U.S. at 392).

"[T]he vast majority of cases brought under the general federal question jurisdiction of the federal courts are those in which federal law creates the cause of action." *Merrell Dow Pharm. Inc. v. Thompson*, 478 U.S. 804, 808 (1986). A federal question is also raised when "the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law." *Peters v. Union Pac. R.R. Co.*, 80 F.3d 257, 260 (8th Cir. 1996) (quoting *Franchise Tax Bd. v. Constr. Laborers Vacation Tr.*, 463 U.S. 1, 28 (1983)). However, "the mere presence of a federal issue in a state cause of action does not automatically confer federal-question jurisdiction." *Merrell*

19

*Dow*, 478 U.S. at 813. "[A] complaint alleging a violation of a federal statute as an element of a state cause of action, when Congress has determined that there should be no private, federal cause of action for the violation, does not state a claim 'arising under the Constitution, laws, or treaties of the United States.'" *Id.* at 817 (quoting 28 U.S.C. § 1331).

The party seeking removal bears the burden of establishing federal subject matter jurisdiction. *See Cent. Iowa Power Coop v. Midwest Indep. Transmission Sys. Operator, Inc.*, 561 F.3d 904, 912 (8th Cir. 2009). Additionally, the court is required to resolve all doubts about whether it has jurisdiction in favor of remand. *See Baker v. Martin Marietta Materials, Inc.*, 745 F.3d 919, 923 (8th Cir. 2014).

### 3. *Removal Based on Federal Officer Statute*

28 U.S.C § 1442(a)(1) provides in pertinent part that:

A civil action . . . that is commenced in State court and that is against or directed to any of the following may be removed by them to the district court of the United States for the district or division embracing the place wherein it is pending:

> (1) The United States or any agency thereof or any officer (or any person acting under that officer) of the United States or any agency thereof, in an official or individual capacity, for or relating to any act under color of such office[.] . . .

*Id.* Removal under § 1441(a)(1) requires four elements: "(1) a defendant has acted under the direction of a federal officer, (2) there was a causal connection between the defendant's actions and the official authority, (3) the defendant has a colorable federal defense to the plaintiff's claims, and (4) the defendant is a 'person,' within the meaning of the statute." *Jacks v. Meridian Resource Co., LLC*, 701 F.3d 1224, 1230 (8th Cir. 2012). In a federal officer removal action, as in other removal actions, "[t]he party seeking removal bears the burden of proving the grounds for its motion." *Ruppel v. CBS Corp.*, 701 F.3d 1176, 1180 (7th Cir. 2012); *see also Betzner v. Boeing Company*, 910 F.3d 1010, 1014 (7th Cir. 2018) (providing that, in the context of federal officer removal,

20

"[t]he party seeking removal bears the burden of establishing federal jurisdiction"); *Bailey v. Monsanto Company*, 176 F.Supp.3d 853, 869 (E.D. Mo. 2016) (providing that the "removing party bears the burden of proving the grounds supporting federal officer removal") (citing *Ruppel*, 701 F.3d at 1180); *O'Brien v. Cessna Aircraft Co.*, No. 8:09CV40, 2010 WL 4721189, at *4 (D. Neb. July 21, 2010) (providing that the party that removed the case "has the burden of establishing federal officer jurisdiction under 28 U.S.C. § 1442(a)(1)").

"[T]he federal officer removal statute was designed to avert various forms of state court prejudice against federal officers or those private persons acting as an assistant to a federal official in helping that official carry out federal law." *Jacks*, 701 F.3d at 1231. However, "not all relationships between private entities or individuals and the federal government suffice to effect removal under the federal officer removal statute." *Id*. In order to fall under the federal officer removal statute, "[t]he assistance that private contractors provide federal officers [must go] beyond simple compliance with the law and help[] officers fulfill other basic government tasks." *Id*. (alterations in original) (quoting *Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142, 153 (2007)).

In considering the first element, acting under the direction of a federal officer, the Supreme Court has explained that "[t]he words 'acting under' are broad" and "the statute must be 'liberally construed'" but the "broad language is not limitless." *Watson*, 551 U.S. at 147. The Supreme Court has interpreted the word "under" to mean "a relationship that involves acting in a certain capacity, considered in relation to one holding a superior position or office" and "typically involves subjection, guidance, or control." *Id*. at 151 (quotations omitted). Further, the Supreme Court explained that "the private person's 'acting under' must involve an effort to assist, or to help carry out, the duties or tasks of the federal superior." *Id*. at 152. "[T]he help or assistance necessary to bring a private person within the scope of the statute does not include simply complying with the law." *Id*. Recently, the First Circuit Court of Appeals succinctly summarized the discussion of "acting under" in *Watson* as follows, "'[a]cting under' connotes

21

subjection, guidance, or control and involves an effort to assist, or to help carry out, the duties or tasks of the federal superior." *Rhode Island v. Shell oil Products Co., L.L.C.*, 979 F.3d 50, 59 (1st Cir. 2020).

The Third Circuit Court of Appeals provides a useful explanation of the second element, requiring a causal connection between the defendant's actions and the official authority:

> [B]efore 2011, proponents of removal jurisdiction under § 1442 were required to "demonstrate that the acts for which they [we]re being sued" occurred at least in part "because of what they were asked to do by the [g]overnment." *Isaacson* [*v. Dow Chemical Co.*,] 517 F.3d [129,] 137 [(2d Cir. 2008)]. In 2011, however, the statute was amended to encompass suits "for or relating to any act under color of [federal] office." 28 U.S.C. § 1442(a)(1) (2011). . . . [T]he Supreme Court has defined ["or relating to"] in the context of another statute: "The ordinary meaning of the [] words ['relating to'] is a broad one—'to stand in some relation; to have bearing or concern; to pertain; refer, to bring into association with or connection with.'" *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383, 112 S. Ct. 2031, 119 L.Ed.2d 157 (1992) (quoting Black's Law Dictionary 1158 (5th ed. 1979)); *see also Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96-97 & n.16, 103 S. Ct. 2890, 77 L.Ed.2d 490 (1983) (same). Thus, we find that it is sufficient for there to be a "connection" or "association" between the act in question and the federal office. Our understanding comports with the legislative history of the amendment to § 1442(a)(1), which shows that the addition of the words "or relating to" was intended to "broaden the universe of acts that enable Federal officers to remove to Federal court." H.R. Rep. No. 112-17, pt. 1 (2011), as reprinted in 2011 U.S.C.C.A.N. 420, 425.

*In re Commonwealth's Motion to Appoint Counsel Against or Directed to Defender Ass'n of Philadelphia*, 790 F.3d 457, 471-72 (3d Cir. 2015) (second, seventh, tenth and eleventh alterations in original). Similarly, the Fourth Circuit Court of Appeals interpreted the addition of "relating to" in § 1442(a)(1) to "broaden the universe of acts that enable federal removal . . . such that there need be only a connection or association between the act in question and the federal office." *Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 258 (4th Cir. 2017) (quotations omitted). More recently, the Fifth Circuit

22

Court of Appeals addressed the second element as follows, "[s]ubject to the other requirements of section 1442(a), any civil action that is connected or associated with an act under color of federal office may be removed" and "to remove under section 1442(a), a defendant must show . . . [that] the charged conduct is connected or associated with an act pursuant to a federal officer's directions." *Latiolais*, 951 F.3d at 296; *see also Baker v. Atlantic Richfield Co.*, 962 F.3d 937, 943-44 (7th Cir. 2020) (following the 3d Circuit, 4th Circuit and 5th Circuit in requiring a connection or association for federal officer removal).

As to the third element, requiring a colorable defense, the Eighth Circuit Court of Appeals has stated that, "[f]or a defense to be colorable, it need only be plausible; § 1442(a)(1) does not require a court to hold that a defense will be successful before removal is appropriate." *United States v. Todd*, 245 F.3d 691, 693 (8th Cir. 2001). "[A]n asserted federal defense is colorable unless it is immaterial and made solely for the purpose of obtaining jurisdiction or wholly insubstantial and frivolous." *Latiolais*, 951 F.3d at 297.

Finally, the fourth element, requiring that the defendant be a person, the term "person" includes corporations. *See Jacks*, 701 F.3d at 1230 n.3 ("[T]he 'person' contemplated by the federal officer removal statute includes corporations.").

### C. Application

#### 1. Federal Officer Removal

##### a. Acted under the direction of a federal officer

While Tyson emphasizes that President Trump's April 28, 2020 Executive Order, and, to a lesser extent, Secretary Perdue's May 5, 2020 letter demonstrate that Tyson was acting under a federal officer, Tyson's emphasis is misplaced. The primary allegations in the Petition all took place prior to April 28, 2020 and May 5, 2020. Indeed, Isidro Fernandez died on April 26, 2020. Petition ¶ 3.

Further, even though President Trump declared a national emergency on March 13, 2020, and issued "Coronavirus Guidelines" on March 16, 2020, the court is

23

unpersuaded that such declarations constitute direction under a federal officer for purposes of removal. Tyson contends that it "operated its facilities—including the Waterloo facility—as critical infrastructure of the United States pursuant to 'critical infrastructure' emergency plans growing out of Presidential Policy Directive 21 of the Obama Administration, which were followed upon declaration of a national emergency." Resistance at 15. Tyson claims that it was "in constant contact with federal officials at the Department of Homeland Security [("DHS")] and the USDA regarding continued operations[.]" *Id*. While Tyson may have been in regular contact with DHS and USDA regarding continued operations of its facilities at the early stages of the COVID-19 pandemic, such contact under the vague rubric of "critical infrastructure" does not constitute "subjection, guidance, or control" involving "an effort to assist, or to help carry out, the duties or tasks of the federal superior." *Rhode Island*, 979 F.3d at 59; *see also Mayor & City Council of Baltimore*, 952 F.3d 452, 466 n.9 (4th Cir. 2020) (noting that "[t]his is a complex case, and we do not intend to suggest that Defendants were required to outline the leases' requirements in painstaking detail in order to satisfy their burden of justifying federal officer removal. But they must provide 'candid, specific and positive' allegations that they were acting under federal officers.") (quotation omitted); *Betzner*, 910 F.3d at 1015 (finding that defendant was acting under the United States Air Force in manufacturing a heavy bomber aircraft "under the military's detailed and ongoing control"); *Ruppel*, 701 F.3d at 1181 ("CBS worked hand-in-hand with the government, assisting the federal government in building warships. 'Acting under' covers situations, like this one, where the federal government uses a private corporation to achieve an end it would have otherwise used its own agents to complete.").

Based on the forgoing, the court finds that Tyson has failed to demonstrate that it acted under the direction of a federal officer. Therefore, removal under the federal officer statute is improper.

### b.    *Causal connection*

Even if Tyson acted under the direction of a federal officer, which it did not, Tyson has failed to demonstrate a causal connection between its actions and the official authority.  First, the primary directives relied upon by Tyson, President Trump's April 28, 2020 Executive Order and Secretary Perdue's May 5, 2020 letter, were issued after the primary allegations in the Petition had taken place.

Second, Tyson incorrectly frames the tort allegations in Plaintiff's Petition. Plaintiff's Petition does not seek damages in tort for Tyson's failure to shut down the Waterloo facility due to the coronavirus pandemic; but instead, Plaintiff seeks damages in tort against Tyson and its named executives and supervisors for alleged fraudulent misrepresentations and gross negligence with regard to the danger, risks and handling of the coronavirus pandemic and COVID-19 outbreak at the Waterloo facility.  *See* Petition ¶¶ 89-141.  While Plaintiff's twenty-seven page Petition may contain four numbered paragraphs out of 150 total paragraphs that suggest that production should have been halted or slowed due to the COVID-19 threat, overall, the allegations in the Petition do not focus on the shutting down of the facility and Plaintiff's allegations of negligence and fraudulent misrepresentation are not directed at Tyson's decision not to shut down the facility.  In fact, even though Tyson claims that they were directed by the President of the United States and the Secretary of Agriculture to keep the Waterloo facility open for purposes of keeping the national food supply chain operating, Defendants did in fact shut down operations at the Waterloo facility from April 22, 2020 to May 7, 2020 due to the coronavirus.  *Id*. ¶¶ 77, 82.  Further, Tyson also closed the Columbus Junction facility due to a COVID-19 outbreak.  *Id*. ¶ 54.

Third, even if Tyson kept the Waterloo facility open and implemented coronavirus safety measures at the direction of a federal officer, the alleged conduct in Plaintiff's Petition is not connected or associated in any manner with the directions of a federal officer.  No federal officer directed Tyson to keep its Waterloo facility open in a negligent manner (failing to provide employees with personal protective equipment, failing to

25

implement adequate social distancing measures, failing to implement adequate safety measures related to the coronavirus) or make fraudulent misrepresentations to employees at the Waterloo facility regarding the risks or severity of the coronavirus pandemic and COVID-19 outbreak at the Waterloo facility.

Based on the forgoing, the court finds that Tyson has failed to demonstrate a causal connection between its actions and a federal authority. Therefore, removal under the federal officer statute is improper.

### c. *Colorable federal defense*

Even if Tyson acted under the direction of a federal officer, which it did not, and demonstrated a causal connection between its actions and a federal authority, which it also did not show, Tyson has failed to demonstrate it has a colorable federal defense.

As already discussed above, Tyson's reliance on President Trump's April 28, 2020 Executive Order and the DPA are misplaced. President Trump's April 28, 2020 Executive Order invoking the DPA was issued after the primary allegations in the Petition had occurred.

With regard to the FMIA, the Act "regulates the inspection, handling, and slaughter of livestock for human consumption." *Harris*, 565 U.S. at 455. "The FMIA regulates a broad range of activities at slaughterhouses to ensure both safety of meat and humane handling of animals." *Id*. "The Department of Agriculture's Food Safety and Inspection Service (FSIS) has responsibility for administering the FMIA to promote its dual goals of safe meat and humane slaughter." *Id*. at 456. The FMIA's preemption clause "prevents a State from imposing any additional or different—even if non-conflicting—requirements that *fall within the scope of the Act* and concern slaughterhouse's facilities or operations." *Id*. at 459-60 (emphasis added). The Supreme Court noted that "state laws of general application (workplace safety regulations, building codes, etc.) will usually apply to slaughterhouses." *Id*. at 467 n.10. While Tyson points out federal regulations promulgated by FSIS regarding infectious disease, *see* Resistance at 19-21, it is difficult to see how these regulations relate to the tort claims alleged in

26

Plaintiff's Petition or the issues raised by the coronavirus pandemic. Tyson has failed to demonstrate that the allegations contained in Plaintiff's Petition fall within the scope of the FMIA. Further, it appears that Tyson's reliance on the FMIA is made for the sole purpose of obtaining jurisdiction. *See Latiolais*, 951 F.3d at 297 ("[A]n asserted federal defense is colorable unless it is immaterial and made solely for the purpose of obtaining jurisdiction or wholly insubstantial and frivolous") (quotations omitted)).

Based on the forgoing, the court finds that Tyson has failed to demonstrate that it has a colorable federal defense to Plaintiff's claims. Therefore, removal under the federal officer statute is improper.

### d.     Summary

The court finds that Tyson has failed to demonstrate: (1) that it acted under the direction of a federal officer; (2) that there is a causal connection between its actions and a federal authority; and (3) that it has a colorable federal defense. Accordingly, Tyson's removal based on the federal officer statute is improper.

### 2.     Removal Based on a Federal Question

Upon review of the Petition, the court finds that the Petition does not assert federal claims, but rather asserts common law tort claims for negligence and fraudulent misrepresentation. *See Markham*, 861 F.3d at 754 (providing that "federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint") (quoting *Caterpillar Inc.*, 482 U.S. at 392). Furthermore, Plaintiff's negligence and fraudulent misrepresentation claims do not allege a cause of action created by a federal statute. *See Merrell Dow*, 478 U.S. at 808 (providing that cases brought under federal question jurisdiction are generally cases where federal law creates the cause of action).

As to Tyson's reliance on interpretation of the DPA, the court has already explained that President Trump's invocation of the DPA on April 28, 2020 in the Executive Order is misplaced because the April 28, 2020 Executive Order invoking the DPA was issued after the primary allegations in the Petition had taken place. Further,

27

Plaintiff's generic passing references in the Petition to federal rules, regulations and guidance or brief mention of CDC guidelines or OSHA standards does not confer federal question jurisdiction. *See Merrell Dow*, 478 U.S. at 813 (providing that "the mere presence of a federal issue in a state cause of action does not automatically confer federal-question jurisdiction"). As Plaintiff points out in their brief, the brief refences to CDC guidelines and OSHA standards in the Petition are for purposes of measuring Defendants' negligence and not claims for relief under CDC guidance or OSHA regulations. *See* Plaintiff's Brief at 11; *see also Bender v. Jordan*, 623 F.3d 1128, 1130 (D.C. Cir. 2010) (providing that "[f]or federal courts to have jurisdiction, the state law claim must turn on an 'actually disputed and substantial' issue of federal law") (quoting *Grable*, 545 U.S. at 314).

Accordingly, the court concludes that the Petition does not contain a federal question and, therefore, the court lacks subject matter jurisdiction over the case.

### 3. *Attorney Fees and Costs*

Neither in the Motion, nor in the brief, does Plaintiff seek attorney fees and costs pursuant to 28 U.S.C. § 1447(c). However, for purposes of closure in this matter, the court will address the issue of attorney fees and costs. Section 1447(c) provides in pertinent part that "[a]n order remanding the case may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal." *Id*. With regard to awarding attorney fees, the Eighth Circuit Court of Appeals has held that "the standard for awarding fees should turn on the reasonableness of the removal. Absent unusual circumstances, courts may award attorney's fees under § 1447(c) only where the removing party lacked an objectively reasonable basis for seeking removal. Conversely, when an objectively reasonable basis exits, fees should be denied." *Convent Corp. v. City of North Little Rock, Ark.*, 784 F.3d 479, 483 (8th Cir. 2015) (quoting *Martin v. Franklin Capital Corp.*, 546 U.S. 132, 141 (2005)); *see also Lussier v. Dollar Tree Stores, Inc.*, 518 F.3d 1062, 1065 (9th Cir. 2008) (providing that removal is not

28

objectively unreasonable "solely because the removing party's arguments lack merit, or else attorney's fees would always be awarded whenever remand is granted").

Even though the court has determined that removal based on federal question jurisdiction is not permitted in this case, the court finds that Tyson did not objectively act unreasonably given the complexity and novel nature of this case. Accordingly, the court, in its discretion, declines to award attorney fees and costs pursuant to 28 U.S.C. § 1447(c).

## V. CONCLUSION

In light of the foregoing, Plaintiff's Motion to Remand (docket no. 22) is **GRANTED**. This case is **REMANDED** to the Iowa District Court for Black Hawk County. Further, all pending motions are **DENIED as moot**. The Clerk of Court is **DIRECTED** to **CLOSE THIS CASE**.

**IT IS SO ORDERED**.

**DATED** this 28th day of December, 2020.

LINDA R. READE, JUDGE
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF IOWA

29